The next argument is in Appeal No. 06-1179, Pfizer, Inc. v. Ranbaxy Laboratories. Mr. Zimmerman, please proceed. Good morning, Your Honor. May it please the Court. The District Court in this case erred with respect to both the 893 and the 995 patents. I'm going to begin with the later expiring 995 patent before turning to the 893 patent. Ranbaxy does not infringe— If we were to hypothetically agree with you on the construction of the 893 and that we're limited to racemates, where does that leave you with respect to the 995? What arguments do you have in your favor with respect to that patent? If you agree with us on the construction of the 893 patent, the 995, we have non-infringement, invalidity of Claim No. 6 under 112, anticipation, double patenting, and obviousness, as well as inequitable conduct. But not an obviousness argument with respect to the 993—I mean to the 893. With respect to the 893, there is no invalidity argument on the 893 patent, only with respect to the term extension. No, no, I'm talking about the 995. If we hold that the 893 doesn't cover racemates, is there any argument that the 995 is obvious or anticipated by the 893? In your question, Your Honor, are you saying the 893 patent is limited to racemates? Yeah. If the 893 patent is limited to racemates, then the 995, we still have invalidity under 112? But there's no argument with respect to the 995 as to obviousness or anticipation based on the 893 if the 893 is limited to racemates. The 893 anticipation argument goes away. The obviousness argument still remains. Turning to Claim 2 of the 995 patent, Rambaxi does not infringe Claim 2 because its product does not contain atorvastatin acid, the sole compound of Claim 2. Rambaxi, therefore, can't infringe Claim 6, which depends from Claim 2, as a matter of law. The District Court erred in failing to assess infringement of Dependent Claim 2 and in finding infringement of Dependent Claim 6, which depends from Claim 2. The District Court also erred in refusing to invalidate Claim 6 of the 995 patent despite recognizing that this claim fails to comply with the statutory requirements of Section 112, Paragraph 4. The District Court's conclusion that, quote, Section 112, Paragraph 4 should not be used to invalidate an issued patent claim is clearly contrary to the statutory language— Well, what about the MPEP, which says that the fact that the dependent claim doesn't incorporate all the limitations of the independent claim isn't a ground for rejection but only should result in cancellation? How does that bear on this? It doesn't bear on this directly at all, Your Honor. The PTO's treatment of dependent claims in the Patent Office does not impact invalidity of an issued claim once it leaves the Patent Office for failure to comply with statute. But what do you understand them to mean when they say it's not a ground for rejection but only a ground for cancellation? What the MPEP— What's the difference between rejection and cancellation? In practice, there doesn't appear to be any real distinction in the Patent Office's treatment of the claims. If you look at the cases Ex parte Mullins and Ex parte Porter, in both of those cases, the examiner actually did reject the claims. In one of those cases, Ex parte Porter, they talk about the proper approach is that it should be an objection, not a rejection. That distinction doesn't make any difference from the standpoint that the PTO rules provide that we will not let a claim out of the Patent Office that we don't believe complies with 112, any of the requirements of 112. But once the claim leaves the Patent Office, there's no basis to distinguish a failure to comply with 112 paragraph 4 from a failure to comply with any other of the paragraphs of 112. And the statutory language of 282 is very clear on that particular point. It says that a claim will be invalid, that it's a defense, invalidity of the patent or any claim in suit for failure to comply with any requirement of section 112. It doesn't distinguish— Well, why should we, in an infringement suit, invalidate a claim just because it's not written the right way? Obviously, the examiner looked at the claim, he saw the limitations, he found that it was patentable in other respects. So why invalidate it just because it's not written the right way? Maybe it should have been an independent claim instead of a dependent claim. Why should we invalidate it because it was incorrectly written as a dependent claim? Because it doesn't comply with statute and the failure of a claim to comply with the statutory requirements, any of the statutory requirements— There's no policy ingredient. There's no reason to do it. It's just because that's what the statute says? Following the statute, yes, Your Honor. So there's no reason behind—there's no reason to invalidate the claim. It's just because the statute tells us to do it. The statute gives us—serves a public notice function. And here, FISER had notice of the deficiency of Claim 6. If they had any basis to fix it, they could have pursued that option. They chose not to. Also, from a policy perspective, this is not a case where FISER is left without a claim to a torvastatin calcium. Claim 1 of the 995 patent is a broad claim that specifically covers salts of the acid and salts of the lactone. FISER withdrew that claim from this litigation and granted Ranbaxy a covenant not to sue for the purpose of trying to treat Claim 6 as an independent claim recognizing the defect. So rather than fulfilling the public policy of doing something to fix the defect, they instead tried to hide it in this case. Turning to the double patenting issue, if the panel doesn't have any more questions on the 112 issue, the district court erred in refusing to invalidate Claim 6 of the 995 patent for double patenting over both Claims 12 and 14 of FISER's earlier issued 080 patent. The 080 patent is not a genus patent, and it's not a patent that requires salt selection. Claim 12 is a process for making two specific lactones, the R enantiomer, a torvastatin lactone, and its corresponding racemic atorvastatin lactone. The claim also encompasses the corresponding acids and pharmaceutically acceptable salts. Thus, the claim recites a process that specifically makes – But this composition is not specifically disclosed in the 880, right? In the 080 patent? 080, excuse me. The 080 patent specifically discloses atorvastatin lactone, the lactone form. But not the salt, right? Well, it doesn't expressly disclose it as a compound, the calcium salt. What it does disclose is the atorvastatin lactone, the R enantiomer, the conversion of lactones to acids by conventional means and the conversion of acids to salts by conventional means. Then it's got a specific listing of salts. It lists seven metal salts, including calcium. So clearly, claim 12 is a recitation of a process for making salts of atorvastatin, which would include the expressly recited calcium salt. Claim 12 of the 080 patent is indistinguishable from this court's Eli Lilly case, Eli Lilly v. Barr, on the salt selection issue. There, a claim to pharmaceutically acceptable salts of fluoxetine rendered a claim to a specific hydrochloride salt unpatentable. Here, we have a claim to pharmaceutically acceptable salts of atorvastatin and a later claim to the specific salt atorvastatin calcium. Moreover, unlike Eli Lilly, the 080 patent expressly discloses the exact salt in question. So it's an even stronger case than Eli Lilly. It doesn't disclose the exact salt. I mean, you can get to it by making combinations, but it discloses a broad genus. It doesn't specifically disclose the species, right? In column 28 of the 080 patent, it discusses pharmaceutically acceptable metal salts. In that listing of metal salts, it specifically discusses and lists calcium. If you look at Claim 12, you have only two lactones, the R-enantiomer atorvastatin lactone. The pharmaceutically acceptable salt of that atorvastatin lactone is atorvastatin calcium. One of the calcium salts is picked out of that list. It's a case where the listing of the pharmaceutically acceptable salts anticipates each of the seven listed salts. It may be a different question if we were talking about a salt that wasn't specifically listed in the 080 patent, but the specific listing of the precise salt in question eliminates any salt selection issue. Claim 14 of the 080 patent narrows the permissible lactones from two to one, only the R-enantiomer in question. The district court erred in failing to construe Claim 14 to include Step B of Claim 12 from which it depends. When that is properly construed, Claim 14 is a process for producing only the R-enantiomer atorvastatin lactone, its corresponding acid, and pharmaceutically acceptable salts. With respect to the 080 patent, the real problem here is that— Specifically. It specifically identifies the R-enantiomer in lactone form, tells you how to convert that lactone to an acid, and tells you how to make salts of that acid. The answer is you can figure it out, but it's not specifically identified in your view. The claim is not specifically—the compound is not specifically named, but the process of Claim 12 specifically tells you how to go from one, first being the lactone, then to the acid, to the calcium salt. It's an express teaching of that salt in Ranback's view. The real problem here is that Pfizer could and should have claimed atorvastatin calcium in the 080 patent. They have a disclosure in the 080 patent that would have supported a claim to atorvastatin calcium, but instead they chose not to. They chose to file a separate application and get a time-wise extension of the monopoly over atorvastatin calcium. And that's all that would happen is they could have terminally disclaimed the 995 to end on the same date as the 080. They chose not to, and the necessary result is a finding of double patent. I'd like to turn now, if the Court doesn't have questions on double patenting, to the 893 patent term extension. The regular term of the 893 patent ends May 30th of this year. So what we're really talking about is the extension. Regardless of whose construction is adopted, the District Court erred in failing to find the patent term extension invalid for lack of disclosure. During prosecution of the term extension, Charles Ashbrook, the prosecuting attorney, had a board decision regarding what the 893 patent describes. He had Pfizer's representations regarding what the 893 patent describes, both of which were from the later prosecution of the 995 patent. We're not here to find the facts. There was a bench trial here. The District Court made findings. The District Court's finding was that Pfizer's representations and the board's decision about the 893 patent were per se irrelevant. That finding cannot stand on this record. The District Court didn't address whether there was gross negligence with the term extension, only whether there was materiality. That finding is clearly erroneous, as both the board's decision saying the 893 patent was limited to racemates and Pfizer's representations would have been important to a reasonable examiner on the PTE standard. You only have two minutes of your rebuttal time. Thank you. Mr. Hutz. Thank you, Your Honor. Welcome. The District Court held here that Pfizer holds two valid, enforceable, and infringed patents, one to a genus of chemical compounds, which embraces all species within that genus, whether specifically named or not, and a second to an unnamed species in the original patent, which is the active ingredient in Lipitor. And the patent law has long recognized those types of improvement, genus and species patents, as encouraging the development of new inventions. The first question is how should we construe the 893. And you have a depiction here of the R enanomer. And as I understand it, the specification also only discloses the racemate version of it. And the question is, should we interpret this claim as going beyond the racemate? And I've read all this expert testimony, and I understand that the formula depicted in the claim, at least according to some people, could be viewed in one context as disclosing only the R enanomer, and in other contexts disclosing the racemate, right? But what I didn't see was testimony that a single depiction in one context could be construed to cover both the racemate and the R enanomer. Can you comment on that? Yes, Your Honor. There is testimony to that effect, and there are examples in the record of where a single formula has been used to embrace both the racemate and the individual enanomer. Where's the testimony that says that a single depiction of the R enanomer can be construed to mean both the R enanomer and the racemate? The testimony is from Dr. Rausch, who is our independent expert, and the testimony is also from the inventor. Yeah, but where? Where in the record? I read this testimony. I didn't see testimony like that. Now, maybe I missed it. That's the whole basis of Dr. Rausch's testimony. Yeah, but I can't deal with that. I mean, what page? Where? What did he say? I can… Well, if you can't find it, you can't find it. Your Honor, it is clearly Dr. Rausch's testimony that the… And I'll have to find it here specifically, if you'll bear with me for just a moment. Dr. Rausch's interpretation of the 893 at J.A. 33668. 33668? Yes, 33668. Okay, where does he say this? Dr. Rausch is there. Yes, Dr. Rausch is talking about it, Column 3. We begin with the 893 patent. I'm sorry. This is 33688. Did I have it on the wrong page? 33668, Your Honor. It's page 1778. 668. Yes. Okay. And it actually can start on the earlier page at line 15, where I asked Dr. Rausch about Dr. Clive criticizing Dr. Rausch's interpretation of structural formula 1, saying that a chemist would never use the same structure, same depiction to represent both a racemate and one of the individual enantiomers, and how would you respond? Dr. Rausch repeated his testimony there, and at page 33— Well, that's just his interpretation of this particular claim. What I'm looking for is testimony from somebody that in this field of art, that it was common to use the R enanomer to represent both at one and the same time the R enanomer and the racemate. There is testimony with regard to the 080 patent. Dr. Clive and Dr. Rausch both agreed that the 080 patent, which has a single structural formula of an enantiomer very similar in the wedges and the dashed lines to what is in the 893 patent. And both Clive and Rausch specifically agreed that that formula embraces both enantiomers and racemates. In fact, you heard Mr. Zimmerman— My question is not directed to what their conclusory testimony was about the interpretation of this particular claim, but whether they testified that in this field of art there are other examples, there is evidence that people would use the R enanomer to represent both at one and the same time. Yes, Your Honor. We're talking about interpreting the 893 patent. I am talking about the 080 patent, which is a different patent, and there a single structural formula of an enantiomer was used that clearly embraces both the racemate and individual enantiomers. The Stocker publication is another example where the same depiction, the same use of wedges and dashed lines is used to depict both the R enantiomer, S enantiomer, and the racemate. Those are two specific examples in addition to— In the Stocker publication they used plus-minus and plus and minus, right? They did, Your Honor, but the structure that is drawn is identical for each of the plus, the minus, and the plus-minus. In other words, there they went on to make it very clear that that same structural formula was intended to mean the plus, the minus, and the plus-minus, but it's the same structural formula. Okay, I don't mean to take up too much of your time on this. So there is plenty of testimony in addition to that, Your Honor, and is the intrinsic evidence of the 893 patent where you look at the meaning of trans, as we have talked about in our brief, and in particular, you go to the column three of the 893 patent, where in column three there is a depiction or a discussion, I should say, about what structural formula one means in this particular patent, which is all, of course, part of the intrinsic evidence. And in that discussion it specifically says that structural formula one, without further limitation, embraces four individual isomers, and it specifically identifies those four isomers, R-trans, S-trans, R-cis, and S-cis. Well, it doesn't specifically say that it encompasses the four possible isomers. Your Honor, it says, and I'm quoting, the compounds of structural formula one above possess two asymmetric carbon centers. This asymmetry in structural formula one gives rise to four possible isomers. Right there, one skilled in the art knows that that structural formula one cannot mean an individual enantiomer, because it says there are four. One skilled in the art would also know it's not limited to a racemate, because that would be only two. So it says, in its broadest aspect, that structural formula gives rise to four possible isomers. It says, it enumerates them, two of which are the R-cis and S-cis isomers, and the other two of which are the R-trans and the S-trans isomers. So it specifically identifies those isomers. It goes on and it says, this invention contemplates only the trans form of the compounds of formula one above. What is the trans form? The trans form has been previously identified earlier as the R-trans and the S-trans. This does not say trans plus minus form. It does not say trans racemic form. It says trans form. And the testimony at trial is extremely clear and agreed to by both the experts on both sides. And that is that trans is an appropriate designation for an individual enantiomer, be it the R-trans or the S-trans, as well as a racemic mixture, which would be two trans isomers, 50-50, and also any mixtures of the two. So this portion of the specification of 893, this intrinsic evidence, makes it very clear that structural formula one is limited solely and only by excluding cis. It is not limited by excluding any specific trans. It embraces all trans, which it has enumerated. If you look more at intrinsic evidence, you look at the title, you look at the introduction, the background, and so forth, it talks about trans compounds. The examples that Your Honor referred to are just that, examples. I don't have to go into the law about how claims are not limited strictly to the examples. And here, there are affirmative statements that the examples are just that, illustrative. Then if we go to the claims that are presented, we see that Claim 5 is the only claim in the whole issued patent which uses plus-minus or a designation of a racemic mixture. Claim 1, upon which Claim 5 depends, does not. If Claim 1 were interpreted as Ranbaxy would, then you would have a situation wherein it would already be limited to a racinate and the plus-minus would be totally superfluous. So if we look at the intrinsic evidence, it is in full conformity with what the patent office held in granting the patent term extension. And remember, a grant of a patent term extension depends upon the claim, at least one, covering the product for which approval was sought and obtained. The patent office was told what the active ingredient in Lipitor was, was told that it was an enantiomer. The patent office had all of the disclosure before it and made the determination that the claims in the 893 patent embraced the pure enantiomer. So we would say very clearly that if you look at the intrinsic evidence, just as it was done in the district court, it fully supports the interpretation that I have indicated, which is that it embraces individual enantiomers as well as racemates, and hence it embraces a torvastatin calcium. With regard to the point, one of the two of the points that Mr. Zimmerman made. Mr. Zimmerman, in response to Your Honor's question about the patent office's treatment of paragraph 4 of section 112, Mr. Zimmerman referred to the Molands case and to the Porter case and said that both of those address the issue of compliance with the dependent claim technicalities as rejections. That's not quite true. Molands or Molands did. It was a board decision that preceded Porter. There were three members of the board on that case. What's the significance in the MPEP in the distinction between a rejection and a cancellation? A rejection is an appealable matter that goes to the board. It is a violation of a statutory requirement. By contrast, where it is an objection, it goes a different route. It goes on petition, and it is a formal matter. That's the difference between the two, and that's how the patent office has always treated any allegation of alleged noncompliance with paragraph 4 of section 112. How do I know that cancellation isn't concerned with matters of patentability? Because how the patent office treats it is it's not a rejection. It is an objection which is petitionable to the commissioner, and the MPEP expressly states, as a nine-member board in Porter specifically said, that the patent office will treat alleged deficiencies under paragraph 4 as a matter not of rejection, as a formal matter, giving the applicant an opportunity to change. No such objection was made during the prosecution of our application that leads to the 893, excuse me, the 995 patent. So what issue was Porter addressing? Whether or not and how to treat alleged noncompliance with paragraph 4 of section 112. What was the issue before them? How were they distinguishing? Just that. About how to treat it, but the alternatives being what? Being a rejection. In other words, how would the patent office deal with it? So the board was considering whether it should be treated as a rejection or a cancellation? Absolutely, and that's why they empaneled nine members of the board, the full board, to consider that, including the same three members that had decided the Molen case approximately two years earlier. So that the patent office, who benefited from the change in the statute that incorporated paragraph 4, has consistently treated that issue as one of a technical compliance, not as a matter of rejection. That is the agency that benefited from the change in the statute, which was based solely and only on generating additional fees and making it easier to prosecute patent applications. So if the patent office, the effective agency, the agency which is tasked with the job of issuing valid patents, treats this matter as one of a mere technicality, we would respectfully submit that once the patent has issued, just as Judge Farnan concluded, paragraph 4 is not a basis for invalidity. And we would urge that that aspect of the Court's decision be affirmed. I would also add, we also contend, that Claim 6 is in fact a proper dependent claim. It is unambiguous as to what it covers. Everyone skilled in the art knows what it covers. Their testimony from their expert agreed as to what it covers. It covers the hemicalcium salt of atorvastatin acid, a.k.a. atorvastatin calcium. There is absolutely no doubt what it covers. And reliance on some generalized statements from other cases where that was not the situation cannot trump the plain meaning of Claim 6. It's the only thing that Claim 6 can possibly say. And if you want to call Claim 6 an independent claim masquerading as a dependent claim, well, fine. The Patent Office didn't. The Patent Office didn't extract its extra $60, which is the maximum difference between an independent claim and a dependent claim at the time. And now that the patent has issued, there should be no valid attack on the grounds of noncompliance with paragraph 4. We have here a genus patent followed by a species patent designed to encourage improvement. Pfizer made a first broad invention that was not limited to stereochemistry other than being in the trans form. It continued the work. It invented then the remarkable molecule, which is responsible for the working of Lipitor, the world's most widely used and sold drug. That's exactly what the statute encourages by the genus-species relationship. This is something that Ranbaxy has totally ignored. A disclosure of a genus does not anticipate or prevent the patenting of an unnamed species within that genus, and yet a genus covers all species, whether named or not. My time is up. If I can answer any questions, I'd be happy to do so. Thank you, Mr. Zimmerman. Thank you, Your Honor. I have just three points that I'll make very quickly. Mr. Hutz alluded to the fact that there is a potential to treat Claim 6 as an independent claim. I want to leave no doubt that the parties stipulated, as a matter of fact, that Claim 6 is a dependent claim. The district court adopted that stipulation. With respect to Judge Dyke's point about is there any evidence in the record that it was common to use an enantiomer to represent all three, there is no such evidence in the record. As for the two examples, Mr. Hutz couldn't have said it better that in each of those, the Stalker and the 080 patent, both of those are very clear that they represent more than one thing. Stalker through the specific plus and plus-minus designations. The 080 patent through specific teachings on how to make both the racemate and the enantiomer. As we explained on page 4 of our reply brief, neither of those are present with the 893 patent. Finally, I'd like to return for one minute to the double patenting issue. The cases of Perricone and Inres Sivaramakrishnan are both instructive. Both of those cases say that disclosure in a list, even though not a specific disclosure, is enough to anticipate. Here we have that. We have a specific disclosure of calcium as the salt. But even if you were to take the position that Claim 14 of the 080 patent is limited to only the R-lactone form, in view of the prior R-893 patent, which teaches converting statin lactones to salts by conventional means, and specifically identifies calcium as a pharmaceutically acceptable salt, Claim 6 of the 995 patent would not be patentably distinct and would be invalid for double patenting over Claim 14 of the 080 patent in view of the prior R-893 patent. Now, what about his comment about the Porter case, the board's in-bank decision? Is it true that the board's in-bank decision treated failure to comply with paragraph 4 as a merely formal matter and not an issue of patentability? They treated it as a matter of objection. In the Porter case, the examiner had made a 112-4 rejection. The board said what you should do is make an objection, and you should either require amendment or cancellation. In either case, you have to make a substantive change to this claim because it cannot issue in the form it's in. That is a substantive change for a reason related to patentability. If it doesn't comply with statute, then you have to make a change. And there's no distinction whether you make that change because it's an objection or a rejection. In either case, you're either going to cancel the claim, in which case it doesn't issue, or you're going to fix the problem. And once you get a claim out of the patent office that doesn't comply with the statute, then 282 makes it express that that claim is invalid. I see that I'm out of time. If the panel has no further questions. Thank you. We'll take the case under review.